Filed 10/28/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>MARTY MIRABAL,<br><br>　　Defendant and Appellant. | H050860<br>(Santa Cruz County<br>Super. Ct. No. 21CR05347) |

Defendant Marty Mirabal appeals after a jury convicted him of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3))[1] and he was sentenced to a term of six years in prison.

On appeal, Mirabal argues the trial court erred by failing to instruct the jury on the lesser included offense of battery and by admitting nonprobative and prejudicial evidence of his homelessness.  He further argues that the prosecution committed misconduct by: 1) improperly shifting the burden of proof, 2) referring to facts not in evidence, and 3) improperly appealing to the jurors' passion and prejudice.  In the alternative, Mirabal contends that to the extent he has forfeited any of these arguments on appeal due to trial counsel's failure to object below, his trial counsel was constitutionally ineffective.

The parties initially waived oral argument, and the case was submitted by order filed on February 14, 2025.  On April 11, 2025, we vacated submission on our own motion, scheduled the matter for oral argument and, by separate letter, requested

---

[1] Unspecified statutory references are to the Penal Code.

supplemental briefing from the parties on the following issues: 1. Since *People v. Hernandez* (2011) 200 Cal.App.4th 1000 (*Hernandez*) and *People v. Miranda* (2021) 62 Cal.App.5th 162, 167 (*Miranda*) both address whether battery (§ 242) is a lesser included offense to a different crime, i.e., rape of an unconscious person (§ 261, subd. (a)(4)), how should this court apply the analysis in either of those cases to deciding whether battery is a lesser included offense to the crime of rape of an intoxicated person (§ 261, subd. (a)(3)), which does not require that the victim be "unconscious[;]" 2. Assuming we were to find that battery is a lesser included offense of rape of an intoxicated person and that the trial court erred in failing to instruct the jury on that lesser included offense, was there a reasonable probability of a more favorable outcome if the jury had been properly instructed as set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)?

As we explain below, we conclude that battery is a lesser included offense of the crime of rape of an intoxicated person, that the trial court erred in not instructing the jury on that lesser included offense, and that Mirabal was prejudiced by that error. We will reverse the judgment and remand to allow the People an opportunity to retry the matter.[2]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On January 21, 2022, the Santa Cruz County District Attorney filed an information charging Mirabal with one count of rape of an intoxicated person (former § 261, subd. (a)(3))[3] and further alleging the following aggravating factors: 1) the victim was

---

[2] Because we are reversing Mirabal's conviction and remanding the matter for a possible new trial, we need not and do not address Mirabal's remaining claims on appeal.

[3] At the time of Mirabal's offense, section 261 provided: "(a) Rape is an act of sexual intercourse accomplished *with a person not the spouse of the perpetrator,* under any of the following circumstances: … ." (Former § 261, subd. (a), italics added.) The italicized language was removed effective January 1, 2022 (Stats. 2021, ch. 626, § 17), but that amendment is not relevant to the issue before us.

particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3));[4] 2) Mirabal took advantage of a position of trust or confidence to commit the offense (rule 4.421(a)(11)); 3) Mirabal's prior convictions are of increasing seriousness (rule 4.421(b)(2)); and 4) Mirabal was on probation when the crime was committed (rule 4.421(b)(4)).

Following a trial, a jury found Mirabal guilty on count 1 and found true two of the aggravating factors, specifically that the victim was particularly vulnerable (rule 4.421(a)(3)) and that Mirabal took advantage of a position of trust or confidence to commit the offense (rule 4.421(a)(11)).

At the November 18, 2022 sentencing hearing, the trial court sentenced Mirabal to the middle term of six years in state prison. The trial court imposed the following fines, fees, and assessments: a restitution fund fine of $1,800 (§ 1202.4, subd. (b)); an additional parole revocation fund fine of $1,800, suspended pending successful completion of parole (§§ 1202.4, subd. (b), 1202.45); a court operations assessment of $40 (§ 1465.8, subd. (a)(1)); and a conviction assessment of $30 (Gov. Code, § 70373). The court awarded total credits of 257 days, consisting of 129 custody credits plus 128 conduct credits pursuant to section 4019.

After this court granted Mirabal's motion for relief from default for failure to file a timely notice of appeal, Mirabal appealed.

---

[4] Unspecified rule references are to the California Rules of Court.

3

### B. Factual background

#### 1. Prosecution's case

##### a. The lobster feed fundraiser[5]

D.S., who was 75 years old at the time of trial, had known Doe and her family since before Doe's birth through their yacht club membership. D.S. had "seen [Doe] grow up" though she had only seen her "maybe four or five times as an adult."

D.S. volunteered to assist with a charity lobster feed at the Santa Cruz Yacht Club on October 23, 2021,[6] and she invited Doe to volunteer at the event with her. D.S. was aware that Doe's children were not at home with her that week and "really wanted [her] to come and enjoy the ambience" of the club where Doe had grown up. After D.S. and Doe finished helping set up for the event, they sat down to eat around 5:00 or 5:30 p.m. and they each had a drink from the bar. D.S. and Doe then helped clean up and had another drink when they finished at 8:00 or 8:30 p.m. D.S. drank vodka martinis, but she could not recall if Doe drank wine or hard liquor that evening. D.S. said goodbye to Doe and left the yacht club around 9:00 p.m. to go home. Doe did not appear to be intoxicated when D.S. last spoke with her.

Doe testified that she was living in an apartment in downtown Santa Cruz in October 2021. D.S. invited Doe to attend the charity event at the Santa Cruz Yacht Club on October 23 and Doe was excited to go and see people she had grown up around. Her young children were staying with her ex-husband's parents for the week. Doe drove to the lobster feed and arrived at the Santa Cruz Yacht Club at 2:30 or 3:00 p.m.

---

[5] The victim was identified at trial as "Jane Doe," and we will adopt that reference herein. (Rule 8.90(b)(4).) We refer to all other testifying witnesses, other than police officers, expert witnesses, and Mirabal, by their first and last initials in order to protect their personal privacy interests as well as Doe's. (Rules 8.90(b)(10), (11).)

[6] All dates are from 2021 unless otherwise specified.

Doe helped set up the tables for the event and then had a drink with the other volunteers, including D.S., around 5:00 p.m. Doe had a gin martini and then ordered a second gin martini toward the end of the dinner. Around 7:00 or 8:00 p.m., Doe had two glasses of white wine that were filled "to the brim."

Doe started chatting with the bartender, B.M., who was the only person at the event who was around her same age.[7] B.M. introduced Doe to her friend, R.K., and the two women invited Doe to go to Brady's Yacht Club (Brady's) with them. Doe went to Brady's in one of the women's cars.

B.M. testified she was working as a bartender at the Santa Cruz Yacht Club during the lobster feed on October 23. B.M. stated that she was the only bartender working at the event and she served Doe a gin martini around 5:00 p.m. that evening. Doe did not order any other drinks from B.M. that night.

When the event ended around 8:00 or 8:30 p.m., B.M.'s roommate, R.K., arrived to give B.M. a ride home. R.K. and B.M. decided that before going home, they would go to Brady's to have a drink.[8] Doe asked if she could join them, and they agreed. R.K. testified that she believed Doe wanted to continue drinking and socializing.

### b. Brady's

R.K. drove B.M. and Doe to Brady's, which took less than a minute. The three arrived between 8:30 and 9:00 p.m. and each of them ordered a drink. Doe ordered a gin and tonic. B.M. began talking to a friend who happened to be at the bar, while R.K. began talking to Doe about parenting. R.K. said that Doe was upset during this conversation because "there was a custody issue" involving Doe's children.

---

[7] At the time of trial in 2022, Doe was 36 years old.

[8] R.K. testified that Doe instigated the trip to Brady's by asking R.K. where the "closest place" to get another drink would be and saying that she wanted to "go somewhere else." R.K. responded that Brady's was the closest bar.

B.M. testified that they were at Brady's for an hour at most because she was tired and there was "no reason for us to stay past one drink." When B.M. told Doe that she and R.K. were leaving, Doe asked for a ride home. Doe lived in the opposite direction however, so B.M. said they could not drive her home.

Doe testified that when she got to Brady's, she bought "a round of drinks" for herself, B.M., and R.K. Doe "probably ordered a gin and tonic" and when the bartender brought her the drink, she "kind of blacked out."

Doe testified that if she drank too much without eating, or if she were tired or on her period, she would black out and experience memory loss. Doe explained further that when she blacks out, she does not lose consciousness and "some people can't even tell" she is drunk. The "blackout" referred to her loss of memory and her "inebriated behaviors" such as "peeing my pants or barfing or acting foolish."

After she blacked out on October 23, Doe did not remember B.M. and R.K. leaving or asking them for a ride home. Doe also did not remember ordering a second drink that night, going into the bathroom, urinating on herself, or being escorted out of the bar. The next memory she had was a bartender telling her " 'I just kicked you out[,]' " but Doe did not know why. Doe did not remember interacting with the doorman in any way, walking down the street with a man dressed like a pirate, or calling her ex-husband at 12:30 a.m. asking for a ride home. Doe did not remember how she left the bar, although she remembers a dirty van, with "a lot of stuff in it." Doe did not recall how she got to the van, nor could she remember anything that was inside it. However, she did remember there was a "pirate flag" on the van and that it smelled "gross."

E.M. was one of two bartenders working at Brady's on October 23. E.M. saw Doe, whom she described as "petite," come into the bar between 8:00 and 8:30 p.m. with two other women. Doe "was loudly talking to the two" women, "lamenting about how sad her life was, how she was unhappy[,] and she didn't have any friends." Given the

6

way Doe was talking, E.M. thought she might be intoxicated. E.M. served Doe a gin and tonic around 8:15 p.m. and was aware that Doe had already been served a drink by the other bartender prior to that.[9] Doe was socializing with other patrons, both male and female.

Around 10 p.m., E.M. noticed that Doe was "slightly disoriented," "heavily intoxicated," and "vulnerable." E.M. saw a man she did not know hanging around Doe and wanted to make sure that Doe was okay, so she asked Doe if she needed assistance. E.M. "made sure that [the man] knew I was going to take care of [Doe] [and] … shooed him away."

Doe told E.M. that she had urinated on herself, but E.M. did not see that her white pants were wet. E.M. touched Doe's pants but they were dry. Doe then said, "I made a mess" and E.M. went into the bathroom and saw that there was a broken glass in a toilet filled with feces. E.M. told Doe, "Let's get you home," and took her outside. Doe could "barely walk."

When they got outside the bar, E.M. asked the doorman, D.D., to get an Uber for Doe. E.M. saw Mirabal, whom she knew as a regular customer at Brady's, outside the front door as well. When E.M. went outside again between 10:30 and 11:00 p.m., Doe was still there and E.M. asked Mirabal to watch her and make sure she did not fall off the curb.[10] E.M. said she tried to use Doe's phone to order an Uber, but Doe "didn't know [her address,] . . . [or] did not [want to] give me [her] address." E.M. also testified that Doe was "fighting" with D.D. because she did not know her address.

---

[9] On cross-examination, E.M. testified that the other bartender served Doe at 8:15 p.m. and she served Doe a second drink later that night.

[10] E.M. explained that the curb outside the bar was "extra large" and "people fall on it sometimes when they're drunk."

E.M. saw Doe again at around 1:15 a.m. inside the bar. Although E.M. was annoyed that D.D. had not kept her outside, Doe "seemed fine" and "less drunk" so E.M. "just let it go because [the bar] was busy." E.M. observed that Doe was "still drunk," perhaps because she was a "small" person. Mirabal had walked in with Doe and E.M. said that Doe "appeared to be happy getting attention" from Mirabal.[11]

D.D. was the doorman and bouncer at Brady's on October 23. Around 10:00 p.m., E.M. led Doe outside and directed D.D. to make sure that Doe was safe, but later she asked D.D. to order an Uber for Doe to get her home. D.D. did not have enough funds to order an Uber for Doe and Doe refused to order one for herself from her phone. As D.D. tried to help Doe order a ride on her phone, Doe started "ranting and [] raving, calling me an asshole and calling the bar an asshole bar[.]" Based on his experience with "a lot of drunk people[,]" D.D. did not think that Doe was "heavily intoxicated" but was "too intoxicated."

Even though Doe was not "sloppy or stumbling or slurring [her words]," D.D. testified she was "overly aggressive." Doe was yelling at D.D. and yelling at one of D.D.'s friends who was outside the bar. D.D.'s friend, who was going through a breakup and was crying, mentioned suicide and Doe said, "you just do it." D.D. clarified that he thought Doe was not encouraging his friend to actually kill herself, but "meant like just get away from it all . . . just escape." At that point, Mirabal pulled Doe aside and they

---

[11] The district attorney refreshed E.M.'s recollection about her testimony at the preliminary hearing about how she ran into Mirabal at a farmer's market a few weeks after the incident. E.M. testified that Mirabal told her that he got Doe's keys from her car and drove her to her apartment. Mirabal also told E.M. that he had sex with Doe that night, but Doe did not have any memory of that when she woke up the next morning. E.M. asked Mirabal if Doe was sober enough to consent and he said she was.

began talking.[12]  D.D. said that Mirabal, "just hung out with her and they . . . talked and . . . joked and smiled and had a great night, from what I saw."  D.D. did not see Doe kiss Mirabal, hold his hand, or flirt with him.  D.D. never saw Mirabal acting inappropriately toward Doe and, to D.D.'s knowledge, Mirabal did not have anything to drink that night.

At some point, Doe and Mirabal walked down the street before returning to the front of the bar.  Sometime between midnight and 1:00 a.m., D.D. was distracted and Doe reentered the bar.  Mirabal told D.D. that E.M. did not want Doe inside and offered to help D.D. get her out.  D.D. and Mirabal approached Doe and Mirabal told her she was not supposed to be in the bar.  Doe said, "oh, yeah, okay[,]" set down a drink and walked out with Mirabal.  Once outside, D.D. saw Doe and Mirabal with a "whole group of people … chatting and smoking."  After the bar closed at 2:00 a.m., D.D. saw Mirabal and Doe walking away together "in good spirits" and it "seemed like they had a . . . connection like they were kindred spirits."

S.C., Doe's ex-husband, testified that he and Doe had been married for three years, and they have two children together.  S.C. and Doe shared custody of their children, both of whom were under 10 years old at the time of trial, and on October 23, the children were staying overnight with S.C.'s parents in Santa Rosa.  S.C. and Doe drank frequently when they were living together and Doe would, because she was petite, occasionally experience blackouts especially if she drank on an empty stomach.  When she had a blackout, Doe would be disoriented and would not remember what happened.  Doe would make poor decisions, such as drunk dialing.  S.C. said that Doe would "have very strong feelings" when she was drunk, but he would not say that she became "irritable."

---

[12] D.D. testified that Mirabal is a "somewhat regular" at Brady's.  D.D. did not know Mirabal "super well" but would speak with him on occasion and, if D.D. was at the bar but not on duty, would "have a beer or something" with Mirabal.

9

Around 12:30 a.m. on October 24, S.C. was awakened by a telephone call from Doe, who sounded intoxicated. She asked him for a ride home in a "flirtatious" or "coy" manner. S.C. had already consumed "four to six beers" that night, had a previous DUI, and had been sleeping so he told Doe to call an Uber instead.

### c. The next morning, October 24

Doe's next memory was waking up in her apartment around 6:00 a.m. on October 24, telling Mirabal to leave. Doe had a top on but was not wearing pants or underwear. Doe remembers feeling scared that morning because she did not know who Mirabal was. Doe did not remember that Mirabal was naked, but she remembers that he put on his shoes and left without saying anything. Later, Doe noticed two glasses with some white wine in them on the floor by the couch. Doe did not remember drinking wine with Mirabal the night before.

Doe did not remember coming home with Mirabal and testified she was not the kind of person who would get a ride home with a stranger. Doe called her mother, L.W., and told her she woke up with a stranger in her apartment but could not remember what happened.[13] Her mother reassured her that she would have "a sense" if "anything happened." Doe did not feel any soreness but was "pretty numb." Doe checked her body but did not notice anything was off. Doe did not think about reporting the incident to the police because she did not think anyone would care. While she was talking on the phone to her mother, S.C. and Doe's then-boyfriend, C.W., called her but she did not answer their calls.

---

[13] L.W. testified that Doe called her that morning and, in response to what Doe told her, L.W. said Doe should go to the hospital or the doctor right away to find out what happened. L.W. was worried because Doe could not remember what happened the night before. Doe cried "a lot" during their conversation.

10

### d. Doe tells C.W. about October 23

At the time of the incident, Doe was in a relationship with C.W., though they were just friends at the time of trial. A few days after the incident, Doe spoke to C.W. about what happened. Doe told C.W. that someone was in her apartment with her when she woke up on October 24, but she did not think that anything happened. Doe said she thought it was her Uber driver because she had a receipt for an Uber.[14] C.W. was angry and he and Doe did not speak to each other for several days.

On Halloween, Doe and C.W. went for a walk to "clear the air." As they talked, Doe said that it did not seem like a "big deal" and she did not think that anything sexual happened. As they were walking, Mirabal rode past them on his bicycle and C.W. said, " 'Is that the fucking guy?' " Doe said she did not know and C.W. got angry, telling her Mirabal "is a fucking problem . . . in the downtown area."[15] C.W. "stormed off" and Doe decided to find Mirabal to ask him what happened.

Doe located Mirabal nearby and asked if he knew who she was. Mirabal said he did. Doe said she wanted to tell her boyfriend that Mirabal was "a gentleman … [who] took me home the other night when I was super drunk and that nothing happened. . . ." Mirabal replied, " 'I wish I could tell you that, but that's not true.' " Doe said, " 'That's really fucked up. I was blacked out.' " Mirabal admitted that he knew, and "said something like I've had the opportunity with pretty girls in the past and I didn't take it and I wasn't going to [] let this opportunity go . . . ." When Doe said she did not remember anything, Mirabal replied, " 'I didn't think that you would' " and was "laughing and acting like it wasn't a big deal . . . ." Doe was angry and, when Mirabal

---

[14] The district attorney's police inspector, Matthew Pursley, testified that there was no record of Doe taking an Uber or a Lyft on the night in question.

[15] On cross-examination, defense counsel asked Doe if, after seeing Mirabal ride past, C.W. said, " 'I know that guy. He's homeless.' " Doe responded, "Some type of piece of shit. Something like that, yeah."

told her he did not use protection with a laugh, she became even more angry and told him he should run if he saw her boyfriend coming after him. Mirabal said he did not "give a shit" and that he "fight[s] cops."

Doe asked for Mirabal's name and then asked if he knew her name. Mirabal said he did, but he used the name that appeared on her driver's license, not the name she went by in her life. That "grossed [her] out" because her address and apartment number were on her driver's license.

Doe started walking back to her apartment and ran into C.W. again. C.W. asked what Mirabal said and Doe told him, " 'He said we slept together.' " C.W. "tore off" but Doe did not see which direction he went.

Doe was in the parking lot by her apartment when C.W. returned. He was angry, called Doe a "whore and a bitch" then went into Doe's apartment and began breaking things.

C.W. testified that he was angry and hurt when Doe told him that she had gone out on October 23 and woke up to find a stranger in her apartment the next morning. Doe tried to reassure C.W. that she did not think anything had happened and that she thought the man was her Uber driver. The only identifying information Doe could give C.W. was that the man wore "an elaborate pirate costume."

C.W. testified about taking a walk with Doe on Halloween to talk about their relationship, saying that, as they walked together along the street, Mirabal rode past them on his bicycle "wearing an elaborate pirate costume." C.W. asked her if that was the man who was in her apartment, but Doe said she did not know. C.W. was getting angry and Doe asked him if he wanted her to go ask Mirabal if he was the man in her apartment.

12

C.W. said that he did and Doe "hesitated[] . . . [and] she was . . . kind of scared." C.W. started walking back to his apartment by himself.[16]

After getting back to his apartment, C.W. sat and thought for a bit, then decided he would go look for the man on the bicycle to "get some answers" about what happened with Doe that night. As C.W. walked back toward where he had seen Mirabal, he saw Doe walking toward him, her "[e]yes wide, shocked . . . ." Doe told C.W. that Mirabal had sex with her. Although Doe sounded as if she "was confused" by her own statement, C.W. thought that Doe had already known that but did not tell him. C.W. was enraged and walked past Doe without another word.

C.W. found Mirabal working on his bike inside a gated area. C.W. walked toward Mirabal and said " 'You like to fuck drunk girls, huh?' " Mirabal did not say anything but lowered his shoulder and tackled C.W.

C.W. and Mirabal fell backwards out of the gate and landed in the street. C.W. managed to get on top of Mirabal and started hitting him. Someone else pulled C.W. off of Mirabal and, before C.W. left, he threatened Mirabal, saying, " 'You're lucky that's all you got. I'll find you again, you fucking piece of shit.' " Mirabal did not say anything to C.W. at any time during their encounter.

C.W. later called the police nonemergency line and, after an officer called him back, C.W. gave his phone to Doe to report what had happened to her on October 23.

### e. Police investigation

On November 1, City of Santa Cruz Police officer Casey Cole spoke with C.W. on the telephone about C.W.'s report of rape of an intoxicated person. C.W. told Cole that he was calling on behalf of the victim, who had gotten very drunk, was taken home by an

---

[16] C.W. testified that his apartment was directly above Doe's.

13

unknown man, and then raped in her apartment. C.W. said that man's (first) name was Marty and that he dressed "like a pirate."

Cole asked to speak to Doe and C.W. handed her the phone. Doe reported that she had been "raped by an unknown man in her apartment" while she was intoxicated and "did not remember what really happened." Doe's voice sounded "very shaky[] [and] embarrassed" and she cried during her conversation with Cole, specifically when describing her conversation with Mirabal on October 31. Cole asked Doe if she would undergo a sexual assault examination at the hospital and she agreed to do so. Cole picked Doe up in his patrol car and drove her to the hospital.

City of Santa Cruz Police detective Trevor Kendall conducted the follow-up investigation of Doe's report. Kendall interviewed Doe, C.W., and other witnesses. Kendall testified that he had "known [] Mirabal for years both on and off duty[,]" and that Mirabal is "the only person I know in Santa Cruz that dresses as a pirate every single day I've ever seen him[.]"

In the course of the investigation, Kendall obtained a warrant and searched Mirabal's van. According to Kendall, the interior of the van was "rather chaotic[] . . . [and] filled with clutter." There were "books; . . . food wrappers; . . . uneaten food; . . . [and] pot[s] and pans." Kendall observed a sleeping bag behind the passenger seat on a "level area" and from the driver's seat "all the way to the back of the van was just filled with clutter." Behind the driver's seat, "there was a bag of garbage[,] . . . a bike frame with no wheels[,] . . . clothing[,] . . . books[,] . . . a plant[, and] . . . a small table." In addition, Kendall located "quite a bit" of "pirate memorabilia or pirate articles." The items included a blanket and a necktie both decorated with skull and crossbones, as well as a book entitled "Blackbeard and Other Pirates of the Atlantic Coast[,]" an issue of National Geographic magazine "about pirates[,]" and clothing that "looked like … pirate

14

garb[.]" Mirabal's van also had a pirate flag affixed to the exterior bike rack.[17] Kendall assumed that Mirabal was living in his van.

### f. Sexual Assault Response Team (SART) examination

Amanda Lamarca testified as an expert witness in sexual assault trauma and sexual assault injury. On November 1, Lamarca conducted a SART examination of Doe at Dominican Hospital. Lamarca noted that Doe was "withdrawn and tearful throughout" the examination.

In the course of the exam, Lamarca found abrasions to the entrance and inner lips of Doe's vagina, and an abrasion on the underside of Doe's clitoris. There was "redness" on the outer lips of Doe's vagina and some bruising of Doe's "anal area." Lamarca testified that the injuries were "indicative of penetrati[on]" and could have been caused by someone's penis penetrating Doe's vagina. Lamarca also noted that Doe had some bruises on the inside and outside of her left upper thigh, as well as a bruise on her right shin.

In Lamarca's opinion, because the injuries to Doe's vagina were still visible nine days after the reported rape, those injuries were "probably pretty significant" when they were inflicted and would have been "extensive and painful." On cross-examination, Lamarca testified that even consensual intercourse can cause abrasions and other injuries to a person's vagina.

### g. Forensic alcohol expert testimony

Dr. Zinaida Brameier, a senior criminalist with the California Department of Justice, testified as an expert in the area of forensic alcohol analysis. According to Dr. Brameier, the effects of alcohol on a person are "extremely individual." Multiple factors determine how an individual reacts to alcohol, such as their size, weight, blood

---

[17] Photographs of both the exterior and interior of the van were introduced into evidence and published to the jury.

physiology, medical conditions, food consumption, fatigue, gender, and history of alcohol consumption.

The first level of alcohol impairment begins in the brain and is characterized by "losing the ability to . . . understand[] reality, . . . [evaluate] risks[,] . . . do[] complex tasks, . . . respond[] to hazards on the road." At very high alcohol levels, alcohol impairs a person's consciousness and memory, but the only data on these effects come from hospitals and morgues, not from clinical studies. As a result, Dr. Brameier testified that it is "probably impossible" to estimate what blood alcohol level would cause a particular person to black out. "A person who is used to drinking alcohol would not black out" at a certain blood alcohol level, but a person who does not frequently drink would do so. However, most people lose consciousness above 0.3 percent.

Dr. Brameier testified that, starting at around 0.1 percent blood alcohol, a person typically would begin slurring their speech, stumbling when walking, and losing their coordination. A person's ability to judge risks becomes impaired starting at 0.05 percent. The level of intoxication at which a person starts to experience memory loss, however, is "very individual." Dr. Brameier explained, "Some people lose memory at much lower concentrations of alcohol[, and] [s]ome people never lose memory." If a person habitually drinks alcohol, they can "mask" their impairment to a degree that others may not be able to tell they were drunk.

In response to a hypothetical scenario based on similar facts, Dr. Brameier was asked to give her opinion of the blood alcohol level of a person who is five feet eight inches tall and weighed 120 pounds who drank three gin martinis, two glasses of white wine, and two gin and tonics between 5:30 p.m. and 3:00 a.m. Dr. Brameier opined that such a person's blood-alcohol-content would be "anywhere between [0].32 percent to [0].46 percent" by 3:00 a.m.

16

On cross-examination, defense counsel presented a hypothetical in which the same person only consumed four gin martinis between 5:30 and 9:30 p.m. Dr. Brameier opined that, in this scenario, the person's theoretical maximum blood alcohol level would be 0.34 percent but that would diminish to 0.15 percent by 3:00 a.m.

### 2. Defense case

#### a. "Sexual assault"[18] expert

Julie Ann Rohr testified that she did not personally examine Doe but she reviewed the sexual assault examination report prepared by Lamarca. In Rohr's opinion, the injury to Doe's anal area could have been caused by something other than intercourse, namely "pressure or straining." As to the injuries to Doe's vagina, there was no evidence of tearing or bleeding, but the abrasions could have been caused by friction during vigorous intercourse and a lack of lubrication. The abrasion to Doe's clitoris could have been the result of penetration but could also have been caused by oral or digital stimulation.

On cross-examination, Rohr testified that Doe's injuries could have been caused by nonconsensual or consensual sex. Rohr also conceded that, if Doe were unconscious and someone forced her legs apart, that force could have caused the bruises to Doe's inner and outer upper thigh. Rohr also admitted that she was not provided with the photographs of Doe's injuries that Lamarca took during the examination, and this made it difficult for her to evaluate those injuries. Rohr testified that injuries to a person's genitals "[t]ypically … heal[] very rapidly." As a result, if Doe's injuries were sustained nine days prior to her SART exam, "they were either very severe at that point in time to still be present [nine] days later or they were sustained more recently."

---

[18] The court qualified this witness, a registered nurse, "to testify and give her expert opinion on the question of sexual assault." A more apt description of the witness's qualifications would be as an expert in assessing sexual assault trauma and sexual assault injury, but we use the designation adopted below.

17

### b. Witness to altercation between C.W. and Mirabal

J.J. testified that he works at a community bike shop and that Mirabal often comes in to repair bicycles. Mirabal was at the shop working on his bicycle when J.J. saw a man come onto the premises and attack Mirabal. The man started hitting Mirabal, who was "focussed [*sic*] working on his bicycle." J.J. said that he did not believe it was a "mutual fight" and he "did not perceive any offense from [Mirabal]" toward the man. J.J. heard the man say "something along the lines of so you like drunk girls, huh[,]" but could not remember if this happened before or after the man started hitting Mirabal. Mirabal ended up on the ground with the man "over him" and J.J. interposed himself between the two to stop the fight. J.J. did not recall Mirabal saying anything to the man at any point during the altercation.

### c. Mirabal's testimony

Mirabal testified on his own behalf. At the time of trial, Mirabal was living in a recreational vehicle, but at the time of the incident, he was living in his van. Mirabal said that he dresses "as a pirate in general[] [and] [w]herever I go that's how I'm dressed."

Mirabal remembered "some of" October 23 and testified that he went to Brady's that day to meet up with one of the bartenders. Due to a miscommunication, however, he showed up at Brady's after the bartender's shift had ended. At some point that evening, Doe approached him and they "start[ed] hanging out." Doe was both friendly and unfriendly toward Mirabal, sometimes "giving me weird, [] angry looks" but also sometimes being nice. Mirabal never saw Doe fall over, vomit, or drool, but he did see her trying to go into the men's bathroom at some point. Soon after that, Mirabal saw E.M. tell Doe she had to leave the bar. Mirabal did not remember E.M. asking him to keep an eye on Doe so she did not fall off the curb outside Brady's.

Mirabal also said that he did not walk anywhere with Doe when they were hanging out together outside the bar and that D.D.'s testimony to the contrary was incorrect.

18

Although there were other bars nearby, Mirabal said he would not have taken Doe for another drink, because "at that point she had enough [to drink.]" Mirabal said he knew Doe should not have more to drink because of the way she was acting and because she had just been kicked out of Brady's. While they were outside, Mirabal and Doe shared a "joint" with a third person.

When Mirabal saw Doe go back inside Brady's, he informed D.D. and told him that Doe was not allowed inside. Mirabal went inside, where he saw Doe sharing a beer with a man, and said "they already kicked you out earlier and so they don't want you in here." Doe replied "oh, okay" and walked outside with Mirabal. It was near closing time and Doe asked Mirabal for a ride, so they walked over to his van. Mirabal testified that Doe's demeanor had changed from earlier in the evening as she had "sobered up a little bit more." Mirabal was not certain if Doe was asking for a ride because she was too drunk to drive, but he had only had one drink that night at Brady's.

Mirabal drove Doe to her car, which was parked by the yacht club, so she could get her house keys. Doe had difficulty remembering where she had parked, although Mirabal thought Doe might have been "playing games" with him, "[t]rying to find out whether she should bring [him] to her car." Mirabal then drove Doe back to her apartment. Doe asked Mirabal to come inside so he went upstairs with her, and she let him into her apartment. Doe poured Mirabal and herself a glass of wine. At some point, Doe showed Mirabal a Renaissance Faire costume in her closet "[b]ecause it was pretty piraty [*sic*]."

Mirabal used Doe's bathroom, which he remembered had a bidet. Doe followed him into the bathroom and used the toilet before he did.

As they sat together on the couch, Mirabal began rubbing Doe's feet and her leg. Doe was conscious and did not resist Mirabal. Mirabal testified they had sex. Just after they had sex and before they fell asleep, Doe told Mirabal that she had a boyfriend.

19

When Mirabal woke up the next morning, he and Doe were both partially clothed. Doe asked Mirabal to leave. Mirabal "mentioned something about getting her number, but … [s]he was making me feel some of type of way" so he left.

Mirabal saw Doe again on October 31 when he was fixing his bicycle at the bike shop. At first, Mirabal thought to himself, "[S]weet. I was hoping to see her again." In his mind, Mirabal was thinking he and Doe could "get to know each a little bit better and see where it goes." Mirabal denied taunting Doe, but he did tell her that they had sex when he went to her apartment. Mirabal also denied that Doe told him that she " 'blacked out[]' " or that she could not remember what happened that night. He denied saying he knew that Doe was in a blackout state, that he "didn't think" she would remember the events of that night, or that he would not have " 'pass[ed] up an opportunity [to have sex] with a pretty girl.' " Mirabal acknowledged that Doe was trying to get answers from him about what happened because she had "[v]ery little memory." During the conversation, Mirabal "chuckled" but said that he was not laughing at her. Doe warned Mirabal that her boyfriend would come after him.

A short time later, C.W. came into the bike shop and confronted Mirabal, saying "you like to sleep with drunk girls." Mirabal said that C.W. had "this all wrong" but C.W. punched him. Mirabal did not know how many times he was hit, but he had a black eye and a bloody nose. Mirabal did not call the police afterward because he does not "trust the police."

On cross-examination, Mirabal admitted that he had books on pirates in his van but denied that he ever read them. Mirabal denied knowing that "rape, pillage[,] and plunder" was a pirate's motto, pointing out "[t]here are various pirates … ¶ … [who] weren't all the same."

20

## II. DISCUSSION

Mirabal argues that the trial court committed reversible error by failing to instruct the jury sua sponte[19] on a lesser included offense of battery as there was substantial evidence to show that he did not and reasonably should not have known that Doe was incapable of consenting to sexual intercourse. The Attorney General has, in his supplemental briefing, withdrawn his prior position that battery is not a lesser included offense of rape of an intoxicated person, but argues that the trial court had no sua sponte duty to instruct on battery as there was not substantial evidence presented at trial to support a theory that Mirabal committed battery but not rape of an intoxicated person.

As discussed below, we agree with the parties that battery is a lesser included offense of rape of an intoxicated person and further agree with Mirabal that there was substantial evidence to show that he committed that lesser offense as opposed to the greater.

### A. Applicable law and standard of review

A trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offenses. (*People v. Howard* (2024) 104 Cal.App.5th 625, 660 (*Howard*), citing *People v. Merritt* (2017) 2 Cal.5th 819, 824.) " ' "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." ' " (*Howard, supra*, at p. 660, citation omitted.) This duty includes issuing instructions on the defendant's theory of the case and defenses relied upon, as well as other consistent defenses for which there is substantial evidence. (*Howard,* at p. 660, citing *People v. Townsel* (2016) 63 Cal.4th 25, 58.) The trial court's duty in this regard extends to lesser included offenses that "find substantial support in the evidence."

---

[19] Mirabal did not request this instruction in the trial court.

21

(*People v. Thomas* (2023) 14 Cal.5th 327, 388–389, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

An instruction is not required when the evidence supporting it is weak, but rather only when the evidence is substantial enough to merit consideration by the jury. (*People v. Vargas* (2020) 9 Cal.5th 793, 827.) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Ibid.*)

"To ascertain whether one crime is necessarily included in another, courts may look either to the accusatory pleading or the statutory elements of the crimes. When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)[20] " 'The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, " '[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " ' " (*Id.* at p. 207.)

We review a claim of instructional error de novo. (*Howard, supra*, 104 Cal.App.5th at pp. 660–662.) In doing so, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

---

[20] The information alleged that Mirabal "did unlawfully have and accomplish an act of sexual intercourse with a person, to wit, JANE DOE, not his [spouse], where said person was prevented from resisting by an intoxicating substance, and this condition was known, and reasonably should have been known by the defendant."

### *B. Battery is a lesser included offense of rape of an intoxicated person*

We briefly address whether simple battery is a lesser included offense of rape of an intoxicated person. As the parties recognize, there is currently a split of authority on this question among California appellate courts as to whether battery is a lesser included offense to rape of an unconscious person under section 261, subdivision (a)(4)). (Compare *Hernandez*, *supra*, 200 Cal.App.4th at p. 1006 [battery is not a lesser included offense of rape of an unconscious person] with *Miranda, supra,* 62 Cal.App.5th at p. 167 [battery is a lesser included offense of rape of an unconscious person].) We are not aware of any published decision which has addressed the similar question as relates to rape of an intoxicated person under section 261, subdivision (a)(3). Whereas the Attorney General initially argued that this court should follow the guidance provided by *Hernandez*, in his supplemental brief he now concedes that *Miranda* is better reasoned.

A battery is "any willful and unlawful use of force or violence upon the person of another." (§ 242.) "Even though the statutory definition of battery requires 'force or violence' ... , this has the special legal meaning of a harmful or offensive touching." (*People v. Page* (2004) 123 Cal.App.4th 1466, 1473, fn. 1, citation omitted.) The crime of battery is complete when there is a single offensive or harmful touching. (*People v. Pinholster* (1992) 1 Cal.4th 865, 961, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459.)

Rape of an intoxicated person is "an act of sexual intercourse accomplished" when the victim "is prevented from resisting by an intoxicating … substance, … and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).)

In *Hernandez*, *supra*, 200 Cal.App.4th, the court held that "battery is not a lesser included offense of rape of an unconscious person" because "an unconscious person could be raped within the meaning of section 261, subdivision (a)(4) without having been

23

subjected to force or violence, or even to a harmful or offensive touching." (*Id.* at p. 1006.) As noted above, however, the "force or violence" necessary to effectuate a battery in violation of section 242 has a particular meaning; only "the least touching" is required to establish the offense. (*People v. Shockley* (2013) 58 Cal.4th 400, 404 (*Shockley*).) The act of sexual intercourse necessarily *requires* more than the " 'the least touching' " (*ibid.*) as it involves penetration of one person's genitalia by another's. (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 ["Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."].)

Consequently, we agree with the parties that, drawing an analogy with the analysis in *Miranda*, battery is a lesser included offense of rape of an intoxicated person. (*Miranda*, *supra*, 62 Cal.App.5th at p. 167.) The act of engaging in intercourse with an intoxicated person who is, by definition, "prevented from resisting" (§ 261, subd. (a)(3)) is *necessarily* a "harmful or offensive" touching (*Shockley*, *supra,* 58 Cal.4th at p. 404) because it is performed without the consent of the other person. "Because a person who is unconscious or too intoxicated to give consent cannot consent to a sexual touching, the touching of such a person is necessarily 'against the will of th[at] person.' " (*People v. Smith* (2010) 191 Cal.App.4th 199, 208 [discussing sexual battery as described in § 243.4, subd. (e)].)

We now examine whether there was substantial evidence to support instructing the jury on the lesser included offense of battery.

### C. Substantial evidence to support battery instruction

As summarized in *Miranda*, " 'A trial court must instruct on a lesser included offense "only if there is substantial evidence to support a jury's determination that the defendant was in fact only guilty of the lesser offense." ' [Citations.] 'This standard requires instructions on a lesser included offense whenever " 'a jury composed of reasonable [persons] *could … conclude*[]' " that the lesser, but not the greater, offense

24

was committed.  [Citation.]  In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.'  [Citation.]  In doing so, we consider the evidence in the light most favorable to the defendant.  [Citation.]" (*Miranda*, *supra*, 62 Cal.App.5th at pp. 176–177.)

In this case, the jury was instructed that, in order to convict Mirabal of rape of an intoxicated person, the district attorney had to prove the following four elements: 1) "[Mirabal] had sexual intercourse with [Doe];" 2) "[Mirabal] and [Doe] were not married to each other at the time of the intercourse;"[21] 3) "The effect of an intoxicating substance prevented [Doe] from resisting;" and 4) "[Mirabal] knew or reasonably should have known that the effect of an intoxicating substance prevented [Doe] from resisting."  The jury was further instructed that "[Mirabal] is not guilty of this crime if he actually and reasonably believed [Doe] was capable of consenting to sexual intercourse, even if that belief was wrong."  Accordingly, in order to convict Mirabal the jury had to find that Doe's intoxication prevented her from giving legal consent (element 3).  The jury also had to find that Mirabal *either knew* that fact (i.e., that Doe was too intoxicated to give consent) or that he *reasonably should have known* that fact (element 4).  If there was substantial evidence that Mirabal both did not know *and* reasonably should not have known that Doe was too intoxicated to give consent, the jury could conclude that Mirabal was guilty of the lesser included offense of battery rather than the greater offense of rape of an intoxicated person.  (*Miranda*, *supra*, 62 Cal.App.5th at pp. 176–177.)  Since Mirabal testified that he did not know Doe was incapable of consenting to sexual

---

[21] See footnote 3, *ante*.

25

intercourse, we examine only whether there was substantial evidence that he reasonably should not have known of her incapacity.[22]

In his briefing, Mirabal focuses on the length of time that elapsed between E.M. ejecting Doe from the bar around 10:00 p.m. to the time that he had intercourse with Doe, i.e., sometime after 2:00 a.m. Mirabal notes that, during that time, he interacted with Doe and states they "talked about veganism and music" and "socialized with other people." Mirabal also cites the testimony of E.M. and D.D. to support his contention that Doe appeared to enjoy Mirabal's company.

Mirabal testified that, by the time she asked him for a ride home, he believed Doe had "sobered up a little bit more."[23] Between 10:00 p.m. and 2:00 a.m., the testimony was undisputed that Doe had nothing else to drink, except when Mirabal saw her reenter the bar[24] and "shar[e] a beer with a gentleman." It is not clear how long Doe was inside the bar this time, but Mirabal's testimony suggests that he approached Doe soon after she

_____

[22] The Attorney General relies heavily on Doe's testimony regarding her confrontation with Mirabal on October 31, specifically her report that when she told Mirabal she was "blacked out," Mirabal responded " 'I know.' " In his testimony, however, Mirabal denied that Doe said anything about being blacked out or not remembering what happened the night he took her home. The Attorney General's arguments are premised on the assumption that Doe's testimony regarding this conversation was more credible than Mirabal's, but we must consider the evidence in the light most favorable to Mirabal. (*Miranda*, *supra*, 62 Cal.App.5th at pp. 176–177.) The court does not make credibility findings when there is competing evidence. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324–325; *People v. Strozier* (1993) 20 Cal.App.4th 55, 63.)

[23] In his opening brief, Mirabal asserts that Doe was "clear-headed enough to use her phone to call her ex-husband about 12:30 a.m." and was "flirtatious and sweet" in that conversation. Mirabal did not testify that he observed Doe make this phone call or that he overheard her tone of voice. Because Mirabal neither saw nor heard Doe make this call, S.C.'s testimony on this subject cannot support Mirabal's contention that he did not know and reasonably should not have known that Doe was too intoxicated to consent to intercourse that night.

[24] E.M. testified she saw Doe in the bar again around 1:15 a.m.

26

entered and convinced her to leave before E.M. or D.D. threw her out.  After Doe got in his van, Mirabal testified that Doe "was having a hard time remembering where she put her car" although he thought that perhaps she was still deciding "whether she should bring [Mirabal] to her car."

Mirabal also testified that, at some point after they arrived at Doe's apartment, but before they had intercourse, Doe showed him her Renaissance Faire costume which was, in his words, "pretty piraty [*sic*]."  Doe also followed Mirabal into the bathroom and used the toilet as he stood there even though they were, in his words, "total strangers." Mirabal further testified that, when they were drinking wine on Doe's couch, Doe did not resist when he started to rub her feet and legs, after which they had sex.  A few days later, when Mirabal encountered E.M. at a farmers' market, he told E.M. that he thought Doe was sober enough to consent to intercourse that night.  Doe herself testified that the only memory she had between getting a second gin and tonic at Brady's and waking up the following morning was a bartender telling her she had been kicked out of the bar. Consequently, once she and Mirabal left the bar, the main evidence as to her level of intoxication came from Mirabal.

Considered in the light most favorable to Mirabal, the evidence supporting the possibility that Mirabal did not know and reasonably should not have known that Doe was too intoxicated to consent to intercourse was sufficiently substantial to require that the jury be instructed on battery as a lesser included offense.  (*Miranda*, *supra*, 62 Cal.App.5th at pp. 176–177.)

### D. Prejudice

"An erroneous failure to instruct on a lesser included offense requires reversal of a conviction if, taking into account the entire record, it appears ' "reasonably probable" ' the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal. Rptr. 2d 870, 960 P.2d 1094];

27

see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 716 (*Ledesma*).)  In a noncapital case, a failure to instruct sua sponte on a lesser necessarily included offense that is supported by the evidence is state law error that we review for prejudice under *Watson, supra,* 46 Cal.2d at p. 818. (*Breverman, supra,* 19 Cal.4th at p. 169.)  " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*).)  "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id.* at p. 956, italics omitted; see also *People v. Larsen* (2012) 205 Cal.App.4th 810, 831 (*Larsen*).)  "We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*Larsen, supra,* 205 Cal.App.4th at p. 831.)

In viewing the evidence in this light, we conclude that there was a reasonable probability Mirabal would have been convicted of battery instead of rape of an intoxicated person had the jury been instructed on that lesser included offense.  There is clearly conflicting evidence in the record as to whether the effect of an intoxicating substance, in this case alcohol, prevented Doe from resisting and, if so, whether Mirabal knew or reasonably should have known that the effect of an intoxicating substance prevented Doe from resisting.  For example, Doe testified that if she drank too much, on occasion, she would black out and experience memory loss.  Doe explained further that when she blacks out, she does not lose consciousness and "some people can't even tell" she is drunk.  Mirabal testified that he engaged Doe in conversation about various topics

outside the bar that night, and both E.M. and D.D. testified that Doe appeared to be enjoying spending time with Mirabal. Mirabal never saw Doe fall over or vomit. E.M. was the only person who testified that Doe displayed any of the typical signs of intoxication described by Dr. Brameier, such as weaving or stumbling as she walked or slurring her speech.[25]

D.D. spent several hours outside with Doe and Mirabal and testified that, in his experience with very drunk people as a doorman and bouncer, Doe was "too intoxicated" but not "heavily intoxicated." He described Doe as "overly aggressive" but she was not "sloppy or stumbling or slurring [her words]."

According to Mirabal, Doe entered his van without assistance, and it appeared to him that she had "sobered up a little bit more." When they arrived at her apartment, Doe asked Mirabal to come inside, after which she poured some wine for both of them and showed him the Renaissance Faire costume in her closet. Doe did not object when Mirabal rubbed her feet and her leg and they subsequently had intercourse.

During deliberations, the jury requested readbacks of: E.M.'s testimony about her conversation with Mirabal at the farmers' market; Doe's testimony and Mirabal's testimony about the confrontation at the bike repair shop; and Mirabal's testimony about what occurred in Doe's apartment. Although not dispositive, juror questions and requests to have testimony reread can be an indication that deliberations were close. (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) Given the content of the testimony requested in this case, it appears that the jury questioned whether Mirabal knew or reasonably should have known that Doe was too intoxicated to consent.

---

[25] E.M. testified that, when she kicked Doe out of the bar at 10:15 p.m., Doe was so drunk she could barely walk. However, when E.M. saw Doe inside the bar again around 1:15 a.m., Doe "seemed fine" and "less drunk."

29

Although Doe testified that, when she confronted Mirabal outside the bike repair shop, he admitted knowing she was too drunk to consent and would likely not remember anything that happened, Mirabal denied saying any such things. We should note that it is not appropriate for this court to weigh the credibility of Doe, Mirabal, or any other witness in this case. That is within the province of the factfinder. Nevertheless, we cannot say that " 'the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, *supra*, 56 Cal.4th at p. 956.)

There being significant evidence from which the jury could have concluded that Mirabal did not reasonably know that Doe was so intoxicated that she was deprived of the ability to consent to intercourse, it is reasonably probable a more favorable result would have been obtained absent the error. Therefore, the trial court's erroneous failure to properly instruct the jury with battery as a lesser included offense cannot be deemed to have been harmless. (See, e.g., *People v. Campbell* (2015) 233 Cal.App.4th 148, 174 [reversing convictions where they "may have resulted from the 'all-or-nothing' choice the instructions gave the jury"].)

As a result, we will reverse the judgment and remand for a possible new trial.

### III.   DISPOSITION

The judgment is reversed, and the matter is remanded to allow the People an opportunity to retry Mirabal for a violation of section 261, subdivision (a)(3) with proper instruction on the lesser included offense of battery.

_____

WILSON, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

GROVER, J.

*People v. Mirabal*
H050860

| Trial Court: | Santa Cruz County<br>Superior Court No.: 21CR05347 |

Trial Judge:       The Honorable Stephen Siegel

Attorney for Plaintiff and Respondent       Shirin Oloumi
The People:

Attorney for Defendant and Appellant       Patricia S. Lai
Marty Jr. Mirabal:

*People v. Mirabal*
H050860